I iMARVIN, Chief Judge.
LSA-Const. Art. 5, § 8, mandated a rear-gument of this appeal before a five-judge panel when one judge of the original three-judge panel dissented to an opinion reversing the judgment of the trial court.
In this litigation between the two former shareholders of a Jonesboro automobile dealership (Ron D’Aguiar Chevrolet-Olds, Inc.) that went out of business at some unspecified time after one investor withdrew from the financially strained dealership in 1983, the trial court rendered a judgment on Green’s main demand on a 1988 promissory note and on Culpepper’s reeonventional demand for Green’s “share” of the debts of the corporate dealership that Culpepper alleged he personally paid after agreeing to buy Green’s half interest in the dealership in 1983.
In this appeal Green initially sought to recover the contractual interest and ten percent attorney fees, as called for in Culpep-per’s promissory note, and to reverse the judgment against him on Culpepper’s reeon-ventional demand. Green contends the trial court ruled on issues that were not raised by the parties in the reeonventional demand and that Culpepper contractually assumed responsibility for all dealership debts when Green withdrew from the dealership. Cul-pepper did not appeal.
We affirm the judgment on the main demand and reverse and render judgment dismissing Culpepper’s reeonventional demand against Green.
MAIN DEMAND
The $76,000 note held by Green represents the balance owed by Culpepper on funds he used for his initial $133,500 purchase of 50 percent ofjjthe dealership’s corporate stock from a third party in 1982. Green bought the other half of the corporate stock for the same price. Green and Culpepper each obtained the funds for their initial stock purchase from a bank that accepted property owned by Green as collateral security for the two loans.
In 1988, Green paid off his and Culpep-per’s bank loans to obtain the release of the collateral. In turn, he accepted Culpepper’s *140 promissory note for $76,897 which was the amount that Green paid to satisfy Culpep-per’s obligation to the bank. Culpepper made only a few monthly payments on the note in 1988 and none thereafter, prompting Green to file his action on the note in 1989.
Culpepper claimed there was no consideration for the note, but the trial court correctly found otherwise, rendering judgment in Green’s favor for the principal balance due on the note, with legal interest from date of judicial demand. Culpepper did not appeal that judgment.
Green initially sought to have the judgment amended to award contractual rather than legal interest, but expressly abandoned this claim at oral argument here, conceding that the trial court’s interest award conforms precisely to what Green sought in his pleadings. Green also claimed the trial court should have awarded ten percent attorney fees, but points to no evidence substantiating an attorney fee award in any amount. Green’s contention that Culpepper stipulated to a ten percent attorney fee award is belied by the record.
| SRECONVENTIONAL DEMAND
The primary issues on appeal arise from Culpepper’s reeonventional demand in which he sought to recover about $100,000 as Green’s “share” of certain dealership debts that Culpepper allegedly paid after he and Green signed a contract entitled “Buy/Sell Agreement” in October 1983, ostensibly ending Green’s relationship with the business. Apparently, both Culpepper and Green had to personally guarantee payment of many corporate debts. On property apparently leased by Green, the corporate dealership operated in the same location under the name Lively-Culpepper for some unspecified time after the 1983 agreement was executed, burdened by considerable debt which eventually forced the dealership to close.
The 1983 agreement contemplated that Culpepper would solely own the corporate dealership. The 1983 agreement is essentially contained on two pages, the third page containing only the attest paragraph and the signatures. We edit and append the agreement to this opinion. Through the first paragraph on page two of the agreement, it is clear that the actual transfer of Green’s stock to Culpepper was conditioned upon the approval of the transaction by the Chevrolet and Oldsmobile Divisions of General Motors and upon Culpepper paying Green $47,390 “cash consideration” within 30 days after GM approval was granted. It is apparent that while neither condition was fulfilled, Culpep-per acted as the sole owner and operated the dealership as Lively-Culpepper after the agreement was executed.
After paragraph two of page two states the $100 and OVC “consideration for this Agreement ... paid by Bobby L. Culpepper” to Green, |4the agreement states that Green “does hereby assign” to Culpepper all rights, title and interest under any leases of property occupied by the corporate dealership and “in return for same, Bobby L. Culpepper hereby assumes any and all liabilities under any leases.” In the next paragraph the agreement states:
That BOBBY L. CULPEPPER does hereby agree to hold harmless A.Y. GREEN, JR. in connection with any indebtedness of [the corporate dealership], including in-debtednesses to General Motors Acceptance Corporation, Jonesboro State Bank and any and all other indebtednesses of said corporation.
While testifying that he unconditionally assumed responsibility for all dealership debts in the 1983 agreement, Culpepper, a Jones-boro attorney, explained that he was not aware of the amount of the debts, or of the fact that the dealership was then insolvent, when he assumed this obligation.
The trial court rescinded the 1983 agreement, notwithstanding that neither party sought this relief in the pleadings or at trial. The court cast Green for about $75,000, representing about $100,000 as Green’s half of the dealership debts that Culpepper claimed he had paid, in testimony uncorroborated by any documentary proof, less $25,000 as the value of Green’s half interest in real estate jointly owned by Green and Culpepper, according to Culpepper’s tangential estimation of the property’s value. The estimate was mentioned when Culpepper was testifying *141 about the amount of a bank loan that was secured by mortgage of the property. Neither the value nor the ownership or possession of the real estate was placed at issue by either party.
|5The court declared Green and Culpepper joint owners of the remaining dealership assets and joint obligors of the remaining debts. Finally, the court ordered Green to return to Culpepper the $47,390 purchase price that was to be paid him by Culpepper when GM approved Culpepper’s purchase of Green’s stock, notwithstanding the absence of evidence suggesting that Culpepper paid any part of the $47,390 price to Green.
SCOPE OF JUDGMENT
Green contends the trial court’s sweeping rescission of the 1983 agreement exceeds the bounds of the issues raised by the parties. Agreeing with this contention, we observe that much of the confusion in the record stems from Culpepper’s erroneous contention or assumption that the 1988 note to Green was for Culpepper’s purchase of Green’s interest in the dealership in October 1983 rather than for the balance owed on Culpepper’s initial investment with Green when they acquired the corporate dealership in early 1982. Culpepper’s assertion that there was “no consideration” for the 1983 agreement was raised only as a misplaced defense to Green’s main demand on the 1988 note, which the trial court correctly found was not related to the 1983 agreement.
Culpepper’s reconventional demand is founded only on his assertions that he paid certain dealership debts (apparently for which he and Green were personally liable) and that Green is responsible for half of these debts. Green pleaded Culpepper’s unconditional hold-harmless assumption of all dealership debts in the 1983 agreement as a defense to Culpepper’s reconventional demand that Green owed him one-half of the debts he paid.
|gA fair reading of the record in a factually accurate light shows that Culpep-per’s reconventional demand required the trial court to rule only on the validity of Cul-pepper’s assumption of debts in the 1983 agreement, and not on the validity of other aspects of that agreement. The court’s rulings on issues not raised by the litigants, while perhaps understandable from the confusing manner in which the case was presented to the trial court, must be reversed. Patrick v. Patrick, 227 So.2d 162 (La.App. 2d Cir.1969), writ denied; Ussery v. Ussery, 583 So.2d 838 (La.App. 2d Cir.1991).
ASSUMPTION OF DEBTS
Without purporting to identify or list the dealership’s debts, the 1983 agreement squarely states that Culpepper
does hereby agree to hold harmless [Green] in connection with any indebtedness of [the dealership], including indebt-ednesses to [GM, the Jonesboro bank] and any and all other indebtednesses of said corporation.
Only after he signed the agreement did Cul-pepper inquire into the dealership’s financial condition and learn that it was “some half a million dollars in the red.”
Culpepper has not argued, here or below, that the hold harmless-assumption of debt paragraph in the 1983 agreement was conditioned on the accomplishment of the stock transfer, with GM’s approval. In the paragraphs following the paragraph stating the “consideration for this Agreement, Buy and Sell, is ... $100” and OVC, the agreement is couched in the present tense, stating that “... GREEN ... does hereby assign to ... CULPEPPER any and all rights, title and interest” in the leases of property occupied by the dealership and that “... CULPEP-PER does hereby agree to hold harmless ... hGREEN in connection with any indebtedness of Ron D’Aguiar Chevrolet-Olds, Inc.” Culpepper candidly stated the sole basis for attempting to avoid his obligation to hold Green harmless from Green’s responsibility for “any indebtedness” of the dealership:
... it was my intention [to assume only] the indebtedness I was aware of and I was not aware of all indebtedness [until after the agreement was signed,] but [the agreement] does say that [I would hold Green harmless in connection with “any indebtedness” of the dealership]. (Our brackets.)
*142 Green knew the dealership was insolvent when the agreement was signed in October 1983, based on monthly and quarterly financial statements that were available to him and to Culpepper. Green also knew that the dealership had failed to pay GM and a bank in Winnfield for new and used cars, respectively, that the dealership had acquired through “floor plan” financing, under which the dealership would pay the respective creditor as each floor-planned car was sold to a retail customer. The dealership’s default in ' this respect caused it to be classified as “out of trust” with GM and the Winnfield bank, two of its major creditors.
Notwithstanding Culpepper’s awareness that neither he nor Green had drawn any money out of the corporate dealership after acquiring it in early 1982, Culpepper sought no information about the dealership’s solvency or its debts from anyone before signing the 1983 agreement. The reason Culpepper gave for his inaction in this regard was simply that he “could not understand” the dealership’s periodical financial statements even if he had looked at them. Culpepper, whose law office was located near’ the dealership, admitted he had access to the financial statements, even before he began acting as the sole Igowner of the dealership, saying, “[I]f I had ... asked ... I’m sure I could have seen them but ... I didn’t know what to ask for
Culpepper does not contend that Green misrepresented the dealership’s financial condition to him when the 1983 agreement was signed, nor that Green, whose arrest on an Arkansas drug charge precipitated his withdrawal from the dealership, misappropriated dealership funds at any time. According to this record, Green was not authorized to sign dealership checks, as Culpepper was, and did not serve as the dealership’s general manager even though he had prior managerial experience in a ear dealership in Bernice, La. Culpepper, an attorney with an active private practice, apparently hired Lively to manage the dealership after the 1983 agreement was signed, and was only occasionally involved in the dealership’s day-to-day operations before and after the 1983 agreement.
The essence of Culpepper’s claim that he should be relieved of his hold-harmless assumption of all dealership debts is simply that Green was aware that the dealership was insolvent and “out of trust” with its major creditors when the 1983 agreement was signed and Culpepper was not. Culpepper admits, however, that he made no effort to ascertain either the amount or the extent of the dealership’s debts before he assumed the responsibility. In these circumstances, and in the absence of a vice of consent, Culpepper’s subjective intention to assume “only the indebtedness I was aware of’ does not relieve him of the hold-harmless obligation in the 1983 agreement. See generally C.C. Arts. 1948-1955. See also and compare Tweedel v. Brasseaux, 433 So.2d 133 (La.1983); Moreland v. Smith, 457 |9So.2d 748 (La.App. 2d Cir.1984), writ denied; and Homer Nat. Bank v. Nix, 566 So.2d 1071 (La. App. 2d Cir.1990), writ denied.
The principle that a person who obligates himself by his signature on a contract is bound by that obligation, in the absence of some vice of consent, is particularly applicable in circumstances where an attorney obligates himself to a lay person. A burdensome obligation in a contract may not be avoided simply because the obligor did not understand the amount or extent of his obligation. Bank of Coushatta v. Patrick, 503 So.2d 1061 (La.App. 2d Cir.1987), writ denied.
Culpepper failed to use available means to ascertain the dealership’s financial condition before signing the 1983 agreement. Under these circumstances, his lack of awareness of the dealership’s “extraordinary insolvency,” as the trial court described it, does not relieve him of the obligation he assumed. Cul-pepper did not allege or offer evidence of a vice of consent to the 1983 agreement. Cul-pepper’s claim against Green for half of the corporate dealership debts paid by Culpep-per is contractually barred.
DECREE
We affirm the judgment in Green’s favor on the main demand. We hereby reverse the judgment in Culpepper’s favor on the recon-ventional demand and render judgment dismissing Culpepper’s reconventional demand *143 against Green, with prejudice. Costs, here and below, are assessed to Culpepper.
AFFIRMED IN PART; REVERSED AND RENDERED IN PART.
BROWN, J., dissents with written reasons.
ATTACHMENT

hoAPPENDIX

BUY/SELL AGREEMENT

STATE OF LOUISIANA
PARISH OF JACKSON
BEFORE ME, the undersigned Notary Public, and in the presence of the undersigned legal and competent witnesses, came and appeared, A.Y. GREEN, JR. and BOBBY L. CULPEPPER, who declared that they have agreed as follows:
That A.Y. GREEN, JR. agrees to sell to BOBBY L. CULPEPPER, 100% of the stock owned by A.Y. GREEN, JR. in Ron D’Agu-iar ChevroleWOlds, Inc.
The act of sale shall be passed before a Notary Public within thirty (30) days from date of approval of the transfer of A.Y. Green’s interest in Ron D’Aguiar Chevrolet-Olds, Inc. to Bobby L. Culpepper.
The consideration for this sale is the sum of FORTY-SEVEN THOUSAND, THREE HUNDRED NINETY AND NO/100 ($47,-390.00) DOLLARS, all of which shall be paid in cash at the time of the passing of the act of sale and assignment of stock in Ron D’Aguiar Chevrolet-Olds, Inc. by A.Y. Green, Jr. to Bobby L. Culpepper.
The obligation of the parties herein is contingent upon the approval of said transfer by the appropriate divisions of General Motors Corporation under the terms and conditions that may be required by General Motors Corporation.
The assets of Ron D’Aguiar Chevrolet-Olds, Inc. are set forth on Exhibit “A” attached hereto and it is the intention of the parties that any and all interest of A.Y. Green, Jr. in and to said assets be transferred to Bobby L. Culpepper, when the stock is transferred in Ron D’Aguiar Chevrolet-Olds, Inc. from A.Y. Green, Jr. to Bobby L. Culpepper.
| nit is understood and agreed that some time may be required to obtain approval from Chevrolet and Oldsmobile Motor Divisions for the transfer of the interest of A.Y. Green, Jr. therein, but that the act of sale shall be passed as soon after said approval has been completed, but not more than thirty (3) days after said approval, provided that that can be accomplished pursuant to any requirements or stipulations made by Chevrolet and/or Oldsmobile Motor Division.
That the consideration for this Agreement, Buy and Sell, is ONE HUNDRED AND NO/100 ($100.00) DOLLARS, and other good and valuable consideration, paid by BOBBY L. CULPEPPER to A.Y. GREEN, JR., which consideration is hereby acknowledged to have been received by A.Y. GREEN, JR.
That A.Y. GREEN, JR. further agrees to and does hereby assign to BOBBY L. CUL-PEPPER any and all rights, title and interest under any leases of property occupied by Ron D’Aguiar Chevrolet-Olds, Inc. in Jones-boro, Jackson Parish, Louisiana, and in return fro same, Bobby L. Culpepper hereby assumes any and all liabilities under any leases.
That BOBBY L. CULPEPPER does hereby agree to hold harmless A.Y. GREEN, JR. in connection with any indebtedness of Ron D’Aguiar Chevrolet-Olds, Inc., including in-debtednesses to General Motors Acceptance Corporation, Jonesboro State Bank and any and all other indebtednesses of said corporation.
That A.Y. GREEN, JR. does hereby further agree to sign any and all documents necessary in order to effect the transfer of his interest in Ron D’Aguiar Chevrolet-Olds, Inc. to Bobby L. Culpepper.
|12THUS DONE AND PASSED in the presence of the undersigned legal and competent witnesses, at Jonesboro, Jackson Parish, Louisiana, on this the 14th day of October, 1983.